No. 99-677

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 141

SOMONT OIL COMPANY, INC.,
a Montana corporation,

        Appellant/Cross-Respondent,

   v.

A & G DRILLING, INC., CAVALIER PETROLEUM,
INC., A. G. WALLS a/k/a/ JOE WALLS, JOHN WALLS,
and STEWART HOWELL, all d/b/a C-W JOINT VENTURE
a/k/a CAVALIER-WALLS JOIN VENTURE,

        Respondents/Cross-Appellants.



APPEAL FROM:    District Court of the Ninth Judicial District,
                    In and for the County of Toole,
                    The Honorable Marc G. Buyske, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

           Gregory J. Hatley, Davis, Hatley, Haffeman & Tighe, Great Falls, Montana

      For Respondents:

           Douglas C. Allen, Corder & Allen, Great Falls, Montana
           Richard L. Beatty, Attorney at Law, Shelby, Montana

      For Amicus Curiae:

           Tommy H. Butler, Special Assistant Attorney General, Montana Department
           of Natural Resources and Conservation, Helena, Montana

           Kemp J. Wilson (pro se), Crowley, Haughey, Hanson, Toole & Dietrich,
           Billings, Montana

                              Argued: May 17, 2001
                          Submitted: May 17, 2001
                           Decided: June 21, 2002

Filed:

                                    _____
                                          Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1     Somont Oil Company, Inc., Appellant/Cross-Respondent, filed suit against A & G Drilling, Inc., Cavalier Petroleum, Inc., A.G. Walls, also known as Joe Walls, John Walls, and Stewart Howell, all doing business as C-W Joint Venture, also known as Cavalier-Walls Joint Venture, Respondents/Cross-Appellants ("C-W"), in the Ninth Judicial District Court, Toole County, to terminate certain oil and gas leases held by C-W. Following trial, the jury rendered a verdict in favor of C-W. Somont appeals the judgment entered upon the jury verdict and certain pre-trial and post-trial rulings issued by the District Court. C-W cross appeals the District Court's award of attorney fees to Somont based on its determination that Somont had standing to prosecute this action. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

¶2     The parties raise the following issues on appeal:

¶3     1. Did the District Court err when it concluded that Somont had standing to compel C-W's release of certain oil and gas leases pursuant to § 82-1-202(1), MCA?

¶4     2. Did the District Court err when it allowed the jury to consider oil prices, economic considerations, and C-W's financial condition in determining whether oil and gas leases had terminated due to a lack of production?

BACKGROUND

¶5     In 1991, C-W purchased a number of oil and gas leases in the Kevin-Sunburst oil field in Toole County, Montana. Most of these leases were established in the 1920s for a specified number of years, i.e., the primary term. Consequently, the primary terms on these leases have

2

long since expired. However, through various habendum clauses, the contracts provide for the leases' extension of an indefinite secondary term. Pursuant to the habendum clauses, the lessee shall maintain a viable leasehold interest as long as the lessee produces oil and gas in paying quantities from said land. Therefore, following its 1991 purchase, C-W held its Kevin-Sunburst leasehold properties pursuant to the contingencies of the habendum clauses.

¶6    In late 1997, Somont offered to purchase a number of C-W's Kevin-Sunburst leases. C-W subsequently declined Somont's offer. Thereafter, on April 10, 1998, Somont informed C-W that it had acquired new leases from the Kevin-Sunburst lessors and that C-W's leases had terminated due to a lack of production. Somont demanded that C-W execute lease releases on the properties. C-W refused to execute the releases and on May 20, 1998, Somont filed suit in the District Court to compel C-W's execution of the releases. The District Court issued a temporary restraining order which precluded C-W from commencing any operations on the leasehold properties prior to a show cause hearing set for May 28, 1998.

¶7    Following the May 28, 1998, show cause hearing, the District Court determined that Somont had not acquired the lessors' right to challenge or terminate C-W's existing leases for failure of production. Therefore, the District Court denied Somont's request for a preliminary injunction and vacated the temporary restraining order. Consequently, Somont obtained from the lessors an assignment of "any and all rights that [the lessors] may have to any and all claims and demands that any previous oil and gas lease on the subject property has expired, terminated or otherwise forfeited due to the cessation of production from the

3

leased lands." On June 12, 1998, Somont filed an amended complaint referencing the assignments. Subsequently, C-W executed releases on twenty of its leases but refused to tender releases on eight of the Kevin-Sunburst leases. Therefore, the parties proceeded to trial on whether C-W's eight remaining leases had terminated due to a cessation of production.

¶8 Prior to trial, the parties raised two issues which ultimately gave rise to this appeal. First, in opposing Somont's motion for summary judgment, C-W insisted that Somont lacked standing to compel a release on five of the eight leases because Somont maintained no ownership interest in those leases. C-W conceded that Somont had standing to prosecute the remaining three because Somont owned some portion of those leases' mineral estate. The District Court denied Somont's motion for summary judgment but concluded that Somont did have standing to challenge all eight leases.

¶9 Second, Somont filed a motion in limine with the District Court to exclude evidence of oil and gas prices as a justification for C-W's lack of production. Further, Somont proposed a jury instruction which stated the jury could not consider oil prices, economic considerations, or C-W's financial condition in determining whether the lack of production was justifiable as a temporary cessation. The District Court denied Somont's motion in limine, in regard to the oil and gas prices, and rejected its proposed jury instruction. On May 11, 1999, the case proceeded to trial.

¶10 At trial, Somont presented evidence indicating a lack of production from the eight oil and gas leases during a specified period of time, the accounting period, prescribed by the

4

District Court. C-W argued that the lack of production was justified as a temporary cessation. Therefore, C-W maintained that the temporary cessation of production doctrine prevented the leases' termination. C-W presented evidence of reduced oil prices, a deflated economy, and the company's financial pressures as justification for the cessation. After presentation of all of the evidence, the District Court denied Somont's motion for judgment as a matter of law and instructed the jury to consider "all surrounding circumstances" in determining whether C-W's leases had terminated for lack of production.

¶11 On May 14, 1999, the jury rendered a special verdict in favor of C-W. In so doing, the jury found that none of the eight leases terminated due to a lack of production. The jury also determined that Somont wrongfully interfered with C-W's contractual and business relationships with the lessors and awarded C-W approximately $10,500 in damages. On May 21, 1999, the District Court entered judgment on the jury verdict and ordered that a hearing be held on June 4, 1999, to consider some remaining issues. On June 2, 1999, Somont renewed its motion for judgment as a matter of law and, in the alternative, moved for a new trial. The District Court denied both requests. On September 2, 1999, in its final order and judgment on the miscellaneous issues, the District Court ordered C-W to pay $30,867.50 in attorney fees which Somont incurred in contesting C-W's standing challenge on the twenty conceded leases. The District Court also ordered Somont to pay $46,221.25 in attorney fees incurred by C-W in defending the action as it pertained to the eight leases.

¶12 On appeal, Somont argues the District Court erred in allowing the jury to consider oil prices, economic considerations, and C-W's financial condition in determining whether the

5

subject leases terminated due to a lack of production. Therefore, Somont appeals the District Court's judgment on the jury verdict and order denying its motion for judgment as a matter of law. C-W cross-appeals on the issue of attorney fees, claiming Somont lacked standing to prosecute this action.

## ISSUE ONE

¶13 Did the District Court err when it concluded that Somont had standing to compel C-W's release of certain oil and gas leases pursuant to § 82-1-202(1), MCA?

¶14 A district court's ruling on standing is a conclusion of law. *Rieman v. Anderson* (1997), 282 Mont. 139, 144, 935 P.2d 1122, 1125. The standard of review of a district court's conclusions of law is whether the court's interpretation of the law is correct. *Carbon County v. Union Reserve Coal Co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

¶15 Of the eight leases contemplated herein, Somont owns a portion of three of the leases' mineral estates. C-W concedes that Somont has standing to compel its release of those three oil and gas leases pursuant to § 82-1-202, MCA. However, C-W argues that Somont lacks standing to compel C-W's release on the remaining five leases.

¶16 Section 82-1-202(1), MCA, provides:

> If the lessee or assignee thereof neglects or refuses to execute a release as provided by this part, the owner of the leased premises may sue in any court of competent jurisdiction to obtain the release, and in such action he also may recover from the lessee, his successor, or assigns the sum of $100 as damages, all costs, together with a reasonable attorney's fee for preparing and prosecuting the suit, and any additional damages that the evidence in the case warrants.

6

Prior to trial, the lessors of the five leases to which Somont owns no mineral estate assigned to Somont the right to sue C-W to compel C-W's release of its oil and gas leases. C-W insists that since Somont is not the *owner of the leased premises,* Somont lacks the requisite standing to compel C-W's release pursuant to § 82-1-202, MCA.

¶17 Montana has long recognized the rule that rights arising from contracts between private individuals are assignable, and that non-assignability is the exception. *Winslow v. Dundom* (1912), 46 Mont. 71, 82, 125 P. 136, 139. In the absence of a non-assignable clause, either party may generally make an assignment of rights under the contract. *Forsythe v. Elkins* (1985), 216 Mont. 108, 113, 700 P.2d 596, 599-600. Further, all that is required to constitute a "real party in interest," for purposes of Rule 17(a), M.R.Civ.P., is that the party be vested with legal title. *Montana Ass'n of Credit Management v. Hergert* (1979), 181 Mont. 442, 449, 593 P.2d 1059, 1063.

¶18 Each of the original leases in question is a contract which provides for the assignment of rights. One of the rights associated with the oil and gas leases is the right to compel termination of a lessee's interest. While the assignment of rights provisions vary somewhat in language, the prevailing effect is that "the privilege of assigning [the estate] in whole or in part is expressly allowed." As rights arising from contracts are freely assignable and the assignment vested legal title in Somont, we hold that the District Court did not err in determining that Somont had standing to compel C-W's release of the leases in question.

7

## ISSUE TWO

¶19    Did the District Court err when it allowed the jury to consider oil prices, economic considerations, and C-W's financial condition in determining whether oil and gas leases had terminated due to a lack of production?

¶20    A district court's ruling on a motion in limine is an evidentiary ruling. *Spinler v. Allen*, 1999 MT 160, ¶ 29, 295 Mont. 139, ¶ 29, 983 P.2d 348, ¶ 29. A district court has broad discretion in determining whether evidence is relevant and admissible and we will not overturn its determination absent an abuse of that discretion. *Spinler*, ¶ 29.

¶21    Further, a district court has broad discretion regarding the instructions it gives or refuses to give to a jury. *Schumacher v. Stephens*, 1998 MT 58, ¶ 21, 288 Mont. 115, ¶ 21, 956 P.2d 76, ¶ 21. We will not reverse a district court on the basis of its instructions absent an abuse of that discretion. *Schumacher*, ¶ 21. When we examine whether particular jury instructions were properly given or refused, we must consider the instructions in their entirety and in connection with the other instructions given and with the evidence introduced at trial. *Schumacher*, ¶ 22. The party assigning error to the trial court's instructions must show prejudice in order to prevail. *Schumacher*, ¶ 22. Prejudice will not be found if the jury instructions in their entirety state the applicable law of the case. *Schumacher*, ¶ 22.

¶22    Prior to trial, Somont filed a motion in limine seeking to exclude evidence of oil and gas prices as a justification for C-W's cessation of production. The District Court denied Somont's motion in limine as it pertained to oil and gas prices. Soon thereafter, Somont

8

submitted its proposed jury instructions to the District Court. Somont's proposed instructions contained the following directives:

> 18. The fact that oil prices may be low; the cessation of production is for economic reasons or because the operators are in poor financial condition cannot form the basis for a justifiable temporary cessation of production.

> 19. Poor condition of the oil market and/or low quality of oil although rendering the well unprofitable to operate does not prevent an automatic termination of the lease when production ceases.

The District Court rejected the above proposed instructions and instead instructed the jury as follows:

> 16. A lease continues in existence so long as interruption of production in paying quantities does not extend for a period longer than reasonable or justifiable in light of all the circumstances involved.

> 17. A lease is not terminated for failure to produce the moment production stops, nor does it terminate the instant production falls below a profitable level. All surrounding circumstances must be taken into consideration before cancellation may be decreed.

Therefore, the jury was allowed to consider testimony regarding fluctuations in oil prices, economic concerns, and C-W's financial instability in determining whether C-W's lack of production was justified.

¶23 Somont argues that the District Court abused its discretion when it denied Somont's motion in limine and failed to exclude oil and gas prices, economic factors, and C-W's financial condition from the jury's consideration. Somont contends that this abuse in discretion sufficiently prejudiced Somont to warrant a reversal of the District Court's judgment upon the jury verdict. We agree.

9

¶24    All of the oil and gas leases subject to this litigation contain a habendum clause fixing the ultimate duration of the lessee's interest. Oil and gas habendum clauses generally consist of two parts, the primary term, which establishes a definite period, and the secondary term which is of indefinite duration. Robert E. Sullivan, *Handbook of Oil and Gas Law* § 40 (1955). The clause obligates the lessee to maintain production on the premises and pay a royalty to the lessor. The clause also provides that if the lessee fails to produce oil and gas within the primary term, the lease will automatically terminate at the end of the primary term. If the lessee maintains production throughout the primary term, the lease will terminate thereafter upon the cessation of production. *See McCullough Oil, Inc. v. Rezek* (W. Va. 1986), 346 S.E.2d 788, 793.

¶25    Once the lease transitions into the secondary term, jurisdictions vary as to what circumstances will precipitate termination of the lease upon the cessation of production. This jurisdictional dichotomy has been described as follows:

> In a number of the producing states the courts treat termination of a lease as involving a cancellation or forfeiture in equity. In these states where production has ceased or is no longer deemed to be in paying quantities, cancellation of the lease will not be decreed where, in view of relevant circumstances, such decree would be unreasonable.
>
> In Texas and several other jurisdictions termination of a lease under the habendum clause is treated as a determinable limitation on the lessee's estate. A cessation of production results in automatic termination except in those cases where the cessation is deemed 'temporary.'

Richard W. Hemingway, *Law of Oil and Gas* § 6.4(B) (3d ed. 1991).

10

¶26 Montana is an ownership-in-place state with regard to oil, gas and other minerals. *Voyta v. Clonts* (1958), 134 Mont. 156, 162, 328 P.2d 655, 659. Essentially, this means oil and gas leases transfer to the lessee a fee simple determinable estate with the lessor retaining a possibility of reverter. *See Krutzfeld v. Stevenson* (1930), 86 Mont. 463, 476-77, 284 P. 553, 556. Therefore, upon the occurrence of a stated event, the lessee's interest automatically terminates. *See Berthelote v. Loy Oil Co.* (1933), 95 Mont. 434, 447, 28 P.2d 187, 191. Here, as in most oil and gas leases operating pursuant to the conditions of the secondary term, the event triggering automatic termination is the cessation of production in paying quantities. *See Berthelote*, 95 Mont. at 448, 28 P.2d at 191.

¶27 This Court has defined paying quantities as the amount of production which would pay a small profit over the cost of operation of the well, excluding from consideration the initial cost of bringing the well into production. *Berthelote*, 95 Mont. at 448, 28 P.d at 191. Therefore, by paying quantities' very definition, the finder of fact must necessarily consider income generated from the property and the expenses incurred in its operation, thus implicating economic influences. *See* Eugene Kuntz, *Oil and Gas* § 26.7(d) (1987). In *Christian v. A.A. Oil Corp.* (1973), 161 Mont. 420, 506 P.2d 1369, this Court articulated the test to determine whether production in paying quantities has ceased. We stated:

> The test for determining whether there was sufficient production or whether the lessee was acting with reasonable diligence in producing and marketing the gas from the leased lands is the diligence which would be exercised by the ordinary prudent operator having regard to the interests of both lessor and lessee. This is a question of fact that will depend upon the facts and circumstances of each case.

11

*Christian*, 161 Mont. at 427-28, 506 P.2d at 1373 (citations omitted). Thus, an oil and gas lease which fails to produce in paying quantities terminates upon cessation.

¶28    However, in an effort to mitigate against the harshness of the automatic termination rule, courts developed the temporary cessation of production doctrine. Pursuant to this doctrine, once a plaintiff establishes that an oil and gas lease has halted production, the burden shifts to the defendant to prove that the cessation was temporary and not permanent. *See Eichman v. Leavell Resources Corp.* (Kan. Ct. App. 1994), 876 P.2d 171, 174. A temporary cessation in production will not trigger an automatic termination of the lease as contemplated in the habendum clause. Kuntz, § 26.8(d). There is some dispute between Somont, C-W, and Amicus Curiae as to whether Montana has adopted the temporary cessation of production doctrine, and, if so, to what extent. Therefore, to clarify any ambiguity, we hereby adopt the temporary cessation of production doctrine as it applies to the oil and gas arena.

¶29    Most jurisdictions, in determining whether a cessation of production is temporary or permanent, consider the cause of the cessation, the time reasonably required to restore production, and the diligence exercised by the lessee in restoring production. Kuntz, § 26.8(e). What constitutes a reasonable time and diligence will depend on the particular facts presented. *See Cobb v. Natural Gas Pipeline Co. of Am.* (5th Cir. 1990), 897 F.2d 1307, 1309. However, jurisdictions vary significantly on which causes contributing to the cessation may be considered in the temporary cessation of production analysis. Those jurisdictions which treat termination as a cancellation or forfeiture in equity generally hold that "the lease

12

continues in force unless the period of cessation, *viewed in the light of all the circumstances, is for an unreasonable time.*" *See, e.g., Cotner v. Warren* (Okla. 1958), 330 P.2d 217, 219 (emphasis added). Conversely, ownership-in-place jurisdictions generally limit temporary cessations to mechanical or production breakdowns. *See* Hemingway, § 6.4(B).

¶30 Here, Somont established at trial that the leases failed to produce in paying quantities during the accounting period prescribed by the District Court. At that point the *Christian* analysis, implicating economic factors, concluded. In turn, C-W asserted that the failure to produce in paying quantities was justified as a temporary cessation. The parties argued to the District Court the circumstances which the finder of fact may consider in evaluating whether the cessation was temporary. The District Court agreed with C-W that the jury should consider "all surrounding circumstances," which, in this case, included oil prices, economic concerns, and C-W's financial condition. Somont insists the District Court erred in its ruling and urges this Court to follow other ownership-in-place jurisdictions' treatment of the temporary cessation of production doctrine. Texas is one such ownership-in-place jurisdiction and we are inclined to follow its lead on this issue.

¶31 In *Watson v. Rochmill* (Tex. 1941), 155 S.W.2d 783, the lessee of an oil and gas lease ceased oil production due to the depressed market for low gravity oil. The lessor filed suit for a judgment declaring the lease terminated. The lessee insisted that the temporary cessation of production doctrine precluded termination of the lease. The Supreme Court of Texas concluded that to prevent termination of the lease pursuant to the temporary cessation of production doctrine, the cessation must be "due to [a] sudden stoppage of the well or some

13

mechanical breakdown of the equipment used in connection therewith, or the like." *Watson*, 155 S.W.2d at 784. Therefore, the court held that the lease had terminated because the oil market did not prevent operation of the well. *Watson*, 155 S.W.2d at 784.

¶32 Adopting Texas's narrow temporary cessation of production test comports with the principles in Montana that: (1) oil and gas leases are to be construed liberally in favor of the lessor and strictly against the lessee; and (2) while forfeitures are usually not favored in the law, due to the peculiar nature of oil and gas leases, forfeitures are here favored.[1] *Christian*, 161 Mont. at 425. Further, Texas's temporary cessation of production standard properly balances the interests of the lessor and lessee. The diligent lessee who takes immediate steps to rectify a sudden halt in production will not lose his or her investment. Similarly, a lessee's self-serving voluntary cessation will not subordinate the lessor's interest in generating income via production. *See* Bruce M. Kramer, *The Temporary Cessation Doctrine: A Practical Response to an Ideological Dilemma*, 43 Baylor L. Rev. 519, 549 (1991).

¶33 In summary, actions commenced to terminate oil and gas leases invoke two distinct inquiries: (1) Is the lease producing in paying quantities?; and (2) If not, was the cessation in production permanent or temporary? As to production in paying quantities, economic considerations are absolutely relevant. However, those very economic considerations should not factor into the temporary versus permanent cessation analysis. A cessation in production

---

[1] While the "forfeiture" terminology is semantically incorrect for ownership-in-place jurisdictions, the principle espoused in the statement remains sound in Montana jurisprudence.

14

will only be deemed temporary when it is caused by a sudden stoppage of the well or a mechanical breakdown of the equipment used in connection with the well, or the like.

¶34     We disagree with Justice Trieweiler's characterization of *Stimson v. Tarrant* (9th Cir. 1943), 132 F.2d 363. It is true that, in *Stimson*, the Ninth Circuit declined to terminate an oil lease when the well ceased production due to the lack of market. However, the analysis in *Stimson* focused solely on the first prong of the two-part test articulated above. In effect, the Ninth Circuit held that a genuine lack of market will not compel termination of an oil lease when the well is fully capable of producing in paying quantities. In other words, if there is a lack of market; if the lease is capable of producing in paying quantities; and if the lessee is using reasonable diligence to market the product, Montana law will deem the lease as one which is "producing in paying quantities" and never reach the temporary cessation of production issue.

¶35     The concepts discussed in *Stimson* were later reiterated in *Christian*, as alluded above. Our holding today has done nothing to disturb the principles discussed in *Stimson* and *Christian*. The equitable notions contemplated therein remain valid considerations but apply only to the "producing in paying quantities" prong of the two-part test. Once it is determined that a lease is not producing in paying quantities, the analysis shifts to the temporary cessation of production prong where the equitable principles no longer factor into the equation. As such, the specific evidence referenced by Justice Cotter maintains no relevance to the inquiry implicated herein and the jury should not have been instructed to consider it.

15

¶36 Accordingly, we hold that the District Court abused its discretion in allowing the jury to consider oil prices, economic considerations, and C-W's financial condition in determining whether C-W's cessation was justified as temporary. Further, the District Court's abuse in discretion sufficiently prejudiced Somont to warrant a new trial.

¶37 Somont insists it is entitled to judgment as a matter of law. Somont urges this Court to remand the matter to the District Court for an entry of judgment in favor of Somont. We decline to do so.

¶38 The standard of review in appeals from a judgment notwithstanding the verdict made pursuant to Rule 50(b), M.R.Civ.P., is the same as that for review of a motion for a directed verdict, and a directed verdict may be granted only where it appears as a matter of law that a party could not prevail upon any view of the evidence including the legitimate inferences to be drawn therefrom. *Ryan v. City of Bozeman* (1996), 279 Mont. 507, 510, 928 P.2d 228, 229. An implicit precursor to the "any view of the evidence" language is the requisite presentation of evidence. Here, C-W presented its evidence under a misinformed standard. C-W has not yet had an opportunity to present its evidence in accordance with the temporary cessation of production factors adopted herein. It would be premature to say that C-W cannot prevail on any view of the evidence. Therefore, we decline Somont's invitation to remand this case for an entry of judgment in its favor.

¶39 Finally, following the jury verdict, the District Court awarded attorney fees in the amount of $30,867.50 to Somont and $46,221.25 to C-W pursuant to § 82-1-202(1), MCA. Section 82-1-202(1), MCA, does permit the prevailing party to recover reasonable attorney

16

fees incurred in prosecuting or defending the action. However, in light of our holding, the District Court will have to reconsider the attorney fee issue following the disposition of this case on remand.

¶40 Reversed and remanded for a new trial.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
_____
Justices

_____
District Court Judge Richard Simonton
sitting in for Justice Nelson

District Court Judge Richard A. Simonton, sitting in for Justice James C. Nelson, concurs.

¶41 I concur in the Court's Opinion. Furthermore, I would like to respond to the dissents because I think their positions change what I understand has been traditionally, and should be, the law in Montana regarding oil and gas development.

¶42 If our goal is the encouragement of oil and gas production rather than speculation, allowing the retention of leases without working them is contrary to that goal. In this case, there has been no production from some wells for three years. In some cases electric meters have been disconnected for two years. When production ceases so there is not even a question of whether there is production in paying quantities, the secondary term of the lease terminates as production is a condition precedent to the continuation of the lease. Since lack of production terminates the secondary term, the only issue should then be whether the lack of production is excusable. The temporary cessation of production doctrine was developed to provide that excuse.

¶43 The dissents would include, as elements of that doctrine, variables such as oil prices, the oil market, and production costs of the operator. Equity, or a justifiable excuse to stop production, should not be dependent upon the efficiency of the operator. If C-W were having financial problems, and if production was not profitable for it, it should have welcomed the opportunity to walk away from the lease and give another operator the chance to produce at a profit for itself and the mineral owner. How equitable is it to the mineral owner who is at the mercy of the operator or producer to decide unilaterally what is profitable and whether to continue production?

18

¶44 The leases are prepared and printed by the producer. Often times the mineral owner will make changes in the language of the printed form or attach an addendum that will be part of the lease. If the producer wants factors such as market price, cost of production, and market availability to be factors in the secondary term of the lease, it can include that language as a part of the lease and make it contractual.

¶45 I agree that any doctrine of temporary cessation of production that precludes forfeiture of the secondary term of the lease should be limited to acts of God and mechanical problems, coupled with a diligent effort by the producer to remedy them.

¶46 The position of the majority results in the development of minerals for the benefit of both the lessor and the lessee and ultimately for the benefit of the consumer. The test for a temporary shut-down is fairly clear and consistent with development.

District Court Judge Richard A. Simonton
Sitting in for Justice James C. Nelson

19

Justice Terry N. Trieweiler concurring and dissenting.

¶47 I concur with the majority's conclusion that the rights associated with the oil and gas leases at issue in this case were assignable and that pursuant to their assignment, Somont Oil Company, Inc., had standing to bring this action in the District Court.

¶48 I dissent from the majority's conclusion that the District Court erred when it allowed the jury to consider oil prices, economic considerations, and C-W's financial condition when it determined whether the oil and gas leases at issue had been terminated due to lack of production. I would conclude that the District Court's evidentiary ruling, as well as its instructions to the jury, reflect the more reasonable approach to termination of oil and gas leases for failure to produce and was more consistent with previous interpretations of Montana law on this subject.

¶49 The issue in this case was simply whether production had ceased permanently within the meaning of the secondary term of the habendum clauses of the leases at issue. There are several standards employed in the various jurisdictions around the country for determining whether cessation is temporary and reasonable or permanent. They are best summarized by the Oklahoma Supreme Court in *Cotner v. Warren* (Okla. 1958), 330 P.2d 217.

¶50 In *Cotner*, the plaintiff held a leasehold estate in oil and gas under lands owned by the defendants. The term of the lease was for one year "and as long thereafter as oil and gas or either of them, is produced from said land by the lessee." Plaintiff suspended production during a dispute with co-tenants but resumed production six months later when ownership rights had been clarified. When defendants sought to remove him from the land for failure

20

to produce, he brought an action to quiet title to his leasehold interest. Plaintiff contended that since the cessation of production was temporary and for good reason, he had not ceased production within the meaning of the secondary clause. The district court agreed.

¶51    On appeal, the Oklahoma Supreme Court, in a case of first impression, noted that other courts in the country had taken various approaches in their determination of what circumstances will justify termination of a lease after the primary term. It summarized those approaches as follows:

> The Kentucky court, in the case of *Lamb v. Vansyckle*, 205 Ky. 597, 266 S.W. 253, 254, had before it a factual situation much the same as here involved. In that opinion it was said,
>
>> 'Nor are we willing to adopt the rule that a lease which is to continue for a definite period, and so long as oil or gas is produced in paying quantities, ipso facto terminates whenever production or development ceases for a brief period of time. On the contrary, we have reached the conclusion that the only fair and just rule is to hold that the lease continues in force unless the period of cessation, viewed in the light of all the circumstances is for an unreasonable time.'
>
> The quoted rule seems to be the most equitable one in such cases. One much more favorable to the lessee is followed in Louisiana where, 'in order to cancel the lease, there must be some evidence that the wells thereon are no longer capable of producing oil or gas in paying quantities; or that the lessee, in closing down the wells, has done so with the intention of abandoning same.' *Tyson v. Surf Oil Co.*, 195 La. 248, 196 So. 336, 341. In Texas, the rule is much more favorable for the lessor although, there, it 'has been modified when there is only a temporary cessation of production due to sudden stoppage of the well or some mechanical breakdown of the equipment used in connection therewith, or the like.' *Watson v. Rochmill*, 137 Tex. 565, 155 S.W.2d 783, 784.
>
> After thorough deliberation, we conclude that the rule quoted above from the *Lamb v. Vansyckle* case is the soundest and most equitable and the

21

same is adopted. Under that rule, the controlling factual finding is whether or not the temporary stoppage in production was for an unreasonable length of time.

*Cotner*, 330 P.2d at 219.

¶52 In *Stewart v. Amerada Hess Corp.* (Okla. 1979), 604 P.2d 854, 858, the Oklahoma Supreme Court clarified that:

> A decree of lease cancellation may be rendered where the record shows that the well in suit was not producing in paying quantities and there are no compelling equitable considerations to justify continued production from the unprofitable well operations.

¶53 In *Stewart*, the court concluded that whether or not the period of suspension is reasonable depends on "all surrounding circumstances." 604 P.2d at 858. The District Court's instructions to the jury were consistent with the rule adopted by the Oklahoma Supreme Court in *Cotner* and elaborated on in *Stewart* and further reflect the approach taken in our prior case law. Because the contract language is the same and the effect on the parties is the same, I would apply the equitable principle in the same fashion.

¶54 In *Stimson v. Tarrant* (9th Cir. 1942), 132 F.2d 363, the Ninth Circuit Court of Appeals, in the only decision to this date which attempted to summarize Montana law on the subject at issue, reflected an approach similar to that adopted by the Oklahoma Supreme Court. In *Stimson*, the question was whether an oil and gas lease automatically terminated upon temporary cessation of production of oil based on a lack of market. The secondary clause in that lease also provided that the lease was to continue for as long after the primary term "as oil or gas, or either of them, is produced." During the secondary term, the lessee

22

ceased production for a period of about fourteen months for lack of a market. The lessor brought a suit in equity for cancellation of the lease. However, the district court found that the lessee had exercised reasonable diligence in attempting to find a market and denied the relief sought by the plaintiff.

¶55 On appeal, the Ninth Circuit noted that although Montana law controlled, there was no reported Montana case directly on point. Therefore, it discussed several Montana cases including *Berthelote v. Loy Oil Co.* (1933), 95 Mont. 434, 28 P.2d 187 (relied on in the majority opinion) which interpreted similar lease provisions. It characterized this Court's decision in *Berthelote* as follows:

> As a whole, it is to be gathered from the opinion that if the lessee uses reasonable diligence to market the gas and is unable to do so, the lease remains in effect. A difficulty with the opinion as authority here is that the court does not clearly relate its discussion to the 'thereafter' clause. Nevertheless it does appear to assimilate that clause with the implied covenant to use reasonable diligence to market.

*Stimson*, 132 F.2d at 364.

¶56 Characterizing this Court's prior decision in *Severson v. Barstow* (1936), 103 Mont. 526, 63 P.2d 1022, the Ninth Circuit stated that:

> The court thought that while the statutory action for cancellation is an action at law, nevertheless the principle of equitable relief governs, 'and courts should in such a case seek to do equity as between the parties,' 103 Mont. at page 534, 63 P.2d at page 1025.

*Stimson*, 132 F.2d at 365.

In conclusion, the Ninth Circuit in *Stimson* held that:

23

In the situation before us the enforced closing down of the wells involved no loss from drainage. There was no intention to abandon the lease. And the storage of the oil underground was as effective as its storage in surface tanks, and obviously more economical. What the lessee did was in the mutual interest of the parties.

*Stimson*, 132 F.2d at 365.

¶57 Based on its review of Montana case law and the equitable considerations cited by the court, the Ninth Circuit affirmed the federal district court's refusal to cancel the parties' lease. There was no discussion of a breakdown of equipment nor suggestion that Montana would follow the harsh Texas rule in that case.

¶58 Finally, this Court in *Christian v. A.A. Oil Corp.* (1973), 161 Mont. 420, 427-28, 506 P.2d 1369, 1373, in spite of its observation that forfeitures are favored in oil and gas leases, held that:

> The test for determining whether there was sufficient production or whether the lessee was acting with reasonable diligence in producing and marketing the gas from the leased lands is the diligence which would be exercised by the ordinary prudent operator having regard to the interests of both lessor and lessee. Sullivan, *Handbook of Oil and Gas Law*, s 91, p. 173, 2 Brown, *Oil and Gas Leases*, 2d ed., s 16.02, pp. 16-49. This is a question of fact that will depend upon the facts and circumstances of each case. *Berthelote v. Loy Oil Co.*, 95 Mont. 434, 28 P.2d 187.

¶59 This Court in *Christian* noted that what may be reasonable with regard to oil production will be different from what is reasonable with regard to gas production. We did not elaborate on how the rule would be different for oil and gas production. However, I would conclude that those are simply circumstances to be taken into consideration by the finder of fact when determining whether temporary cessation was reasonable.

24

¶60 To follow the more arbitrary and inequitable approach taken by the majority based on Texas decisional law and the distinction between "forfeiture and equity" and "ownership in place" exalts form over substance and denies the fact finder in this case and future cases the opportunity to consider many relevant circumstances regarding the temporary suspension of production.

¶61 Furthermore, while in the authorities relied on by the majority there is substantial discussion about the rights of the lessor, it is worth noting that the lessor in this case did not feel sufficiently aggrieved by C-W's conduct to cancel the leases in question. Only Somont, which sought to interfere with C-W's contractual relationships for its own benefit, brought this action.

¶62 For these reasons, I dissent from the majority opinion. I would affirm the judgment of the District Court.

_____
Justice

Justice Patricia O. Cotter joins in the foregoing concurrence and dissent.

_____
Justice

Justice Patricia O. Cotter concurs and dissents.

¶63 I concur in Justice Trieweiler's concurring and dissenting Opinion. I write separately to set forth some of the evidence introduced at trial which the jury considered, and which I believe was necessary to and underscored the correctness of their decision.

¶64 The jury heard evidence that other producers, including Somont, often simply walked away from wells and waited until spring, when faced with frozen wells requiring repair. The jury also heard evidence that when the price of oil is low, wells are often shut down. In addition, they heard testimony from a long-time operator in the Kevin-Sunburst area, R. D. McPhillips, to the effect that C. W. acted as a prudent operator in light of all the circumstances. Somont offered no independent testimony to the contrary.

¶65 Another matter upon which the jury heard evidence arose out of the counter-claim of C. W. against Somont. C. W. introduced evidence at trial that after Somont's attempts to purchase the leases in 1997 were rebuffed by C. W., Somont started investigating C. W.'s finances. It contacted the president of a bank to discuss the potential of the bank foreclosing against C. W., and also contacted other mineral owners of C. W.'s leases, asking them to give Somont new leases. C. W. therefore argued that part of its cessation of production resulted from Somont's interference with its financing. The jury had every right to take this information into account in determining whether C. W.'s failure to produce in paying quantities was justified as a temporary cessation.

¶66 If *Christian v. A.A. Oil Corp.*, is still good law, and this Court's reliance upon it at

26

¶ 27 of its Opinion certainly suggests that it is, I do not see how a jury can make an informed factual determination of whether the lessee has exercised the diligence of an ordinary prudent operator, without taking into account all relevant factors, including oil prices, poor conditions on the oil market, financial conditions of the operator, and what other prudent operators do under the same or similar circumstances. I therefore join in Justice Trieweiler's concurring and dissenting opinion. I too would affirm the judgment of the District Court.

_____
Justice